Arguments not to exceed 15 minutes per side Mr. Astorino for the appellants. May it please the court. We're here today to discuss a summary judgment that was granted at the lower court on qualified immunity issue. At the end of the day this case comes down to a dispute of material facts. There are several facts on each side which are in disagreement in this case. The distances between the parties, the positioning of the parties, whether spoken words were overt threats, and the actions of these parties in the final seconds of Joshua Blau's life are vitally important and under very much disagreement in this case. Summary judgment mandates that at this stage the facts of the matter are taken in the light most favorable to appellants. Our version of facts in this case with ample support from the record is that Joshua Blau was at least 20 feet from any person at the time he was shot. He was turning to run away. He had a small pocket knife that was legal to possess at the time of his death. And that he hadn't... That doesn't exactly align with what your client said right after the accident, the shooting, is that correct? Yes, we understand that at that time she was under a lot of emotion. But I mean it's true that she said something quite different initially. In her initial interview, that's correct. I understand the argument that we don't need to pay much attention because she was under stress, that's the argument. But it's true that that is a part of the record. At her initial... The things in the light most favorable to her, I acknowledge that, but it's there. Correct, in her initial interview. And we think that's a perfectly acceptable point for the defense to bring up at trial. Continuing on with this, in the light most favorably viewed towards the plaintiff in this case, the cases that closest align with this are Tennessee v. Garner and Bouges B. Mattingly. Tennessee v. Garner has been good law in this nation for over 30 years and it clearly says that if someone is running away from the police, you cannot use deadly force unless they are an imminent threat to someone in the immediate area. And that's just not the case here. So could you be very precise as to what the evidence is that he was running away? Sure. We have statements from Ms. Reich saying that he was turning to run. Her statement was made in a deposition or what? Correct. In a deposition, that he was turning away. Under cross-examination, yes. I thought she said he turned around and took one or two steps. Is that not right? I believe her exact statement was that he took a step like this motion and went to move away. So he wasn't... You said earlier, turned around and running away. That's not exactly what she testified to. Well, that brings me to the ballistic evidence in this case. I'm sorry to interrupt you. Yes. It isn't exactly what she testified to, right? Her testimony is that he took a step to turn. So he made the statement that you're going to have to kill me. He stepped, just tell me if I'm wrong about this, he stepped away and took one or two steps. Is that inaccurate? I believe it was all one motion. I think that's what her testimony was. Okay. That brings me to the ballistic evidence. And the ballistic evidence says, and I'm going to exhibit my lack of flexibility here, but the first bullet entered somewhere around this region, moved from back to front, and that's consistent with her statement that he was turning to run away. How do we know that was the first bullet? That is a question for the jury. Okay. But you used that word. Correct. Because in this case, we have to take the facts most favorable to us. Who testified that it was the first bullet? Amanda Reach. But how would she know? She stated that when he was turning around, they first shot him in the back. He then turned around and said, you shot me. And that's when they shot him again, this time in the front of the side, which the bullet came in this way after grazing his arm. Judge Depar asks you, how would she know? Because she doesn't, I don't think she, there's no testimony that she had medical expertise, right? Correct. And the reason that I emphasize that is because the ballistics expert said that he determined the sequencing of shots based on testimony. He said that there was no... That would have been hers. He ignored her testimony. But her testimony matches up with the positioning of the bullets. Her description of how the shots occurred matches up with the ballistic evidence as how they came in. And she was there. How close was she? Correct. She claims that she was roughly 20 feet away. And so, and she claims that she heard him say, you've shot me. You shot me. Between the two shots. Correct. And that she, and she claims that she saw him turn to face the police. Because her testimony is that he was turning away. He was shot through the back. And then he turns to face the police and says, you shot me. And then gets shot again. Correct. And the exact positioning of that is basically confirmed by the ballistic evidence. Her testimony is supported by the positioning of the shots where they came into the body. But we wouldn't know which one of the shots came first by the ballistic evidence. We just know the ballistic evidence is that a bullet went through the arm and the front. And another bullet went through the back. But we don't know the order. And they're called A, B, and C. But nobody of the ballistic experts says which was first. He will not confirm that. Meaning who? The prosecution that he only determined the sequencing of the shots based on the officer's testimony of how they perceived the situation. He had no scientific way to determine which shot came first. And so that becomes a question for the jury. I'm sorry to interrupt you. Can I walk back to the distance which you passed by? The distance 20 feet comes from her affidavit. Because at her deposition, so Judge Cook gave you what she said initially. Then at her deposition I thought she said she didn't know the distance. Is that accurate or am I misremembering? I don't think that's exactly right. Basically the question was posed to her in her deposition. How far away is she? Was it 20 feet, 30 feet, 40 feet? It's the classic deposition question. What was her answer? Her answer was I would say about 20 feet. And then when pressed further on that she said I don't want to guess further. In her deposition, as I'm reading it, the question was, I'm trying to get an idea, was Josh 10 feet away, 20 feet, 30 feet away, 50 feet away? And the answer is I would say about 20. Right. Brings me to the affidavit, which I'd like to discuss very briefly. There is case law out there that says affidavits to sharpen or bring points into focus are allowed. The cases that were cited by the defendants saying that affidavits are not allowed at that point, they were based on cases where they were basically sham affidavits that were looked at. Can I move you back to the deposition? She then said I don't feel comfortable with estimating the length I'm summarizing. I don't feel comfortable with it. So your testimony is you have no idea how far Blow was from the officers when he was shot, right? But if it was far enough he wasn't a threat. That's what she said when pressed, right? At the deposition? I think after she had said 20 feet. Right. But then she said I have no idea. That's the sharper focus we're talking about, maybe. Well, and that's why going back, it's important that she said 20 feet first because her affidavits supports Wait, but if you say, okay, he was 5 feet, and then someone presses you to say, oh wait, I have no idea. You're saying we should accept 5 feet and not I have no idea? I think that's an important credibility determination. Once you have conflicting testimony in a deposition... No, no, no. The case law is once you have conflicting testimony, you disregard the testimony for summary judgment purposes. Okay. Right? Am I right about that? I mean, you could be. It's a... Well, it's a yes-no question. I think in this case it's important to determine the credibility of the witness. And you have to take her deposition in the light most favorable to her as the party opposing summary judgment. And she did say at pages 103 to 104 of her deposition, I would say about 20. Again, she's got a question. Yeah, it was probably 20 feet being when he took a step toward them. And then a couple pages later, at 105 to 106, I believe it is her counsel says, don't guess. And she says, okay. And then she says, yeah, I don't feel comfortable with the estimated length. I don't feel comfortable with it because it's been a long time and I just don't feel comfortable with estimating on that. And then she... So your testimony is you don't have any idea how far Josh was from the officers. Right. But he was far enough. So the interesting question is, is it a conflict in her affidavit with this entirety of her deposition? I don't think it presents that way. And I think that's a question for the jury. And I have just a few seconds left. I think it's important to note that everyone involved here agreed on the landmarks, if not the exact distance. And that's what needs to be talked about at some point. Thank you. Am I to wait for this or shall I go? It will start. Okay. Morning, Your Honors. Jason Bell. It's my privilege to represent the City of LA. We also represent the officers in their individual capacities in this Qualified Immunity Summary Judgment Appeal by the other side. We won at the lower court level. The court knows that. I'd like to address some of the issues that have been addressed already. I can go through the facts or however we want to. But really quickly, the ballistics evidence that was referred to, you guys have these photographs. Dr. Smock testified very clearly as to the shot sequence. And he testified very clearly that Mr. Blau, the evidence in this case supports that Blau was going at the officers at the time they were shot. So I saw that testimony. Can you explain to me how he would know the shot sequence? He says that the graze on the arm is the first shot. And then it entered the chest. And then as he went like that, the second shot came in right here. I recognize what he said. I don't understand how he knew that except for reliance on the officers. He may have relied on the officers for saying that. In other words, Mike, I'm sorry, I should ask a better question. It's not scientific. As to the order that could be, as to the fact that he was going at the officers, that is scientific. And we're missing a major piece here. There is independent testimony. Are you saying it's scientific in answer to Judge Thapar? Are you saying it's scientific because the doctor recognizes the difference in the wound entry? He said grazing. That's what I'm wondering if that's your point. Yes. That the medicine slash science. I think that is his testimony. Now they can cross-examine that or whatever, but I think that's Smock's opinion. He very clearly in his report says wound A is associated with the first bullet. Wound B is associated with the second bullet. How does he know that? I don't know. I don't know. So you do not have any independent scientific witness for testimony even from Smock saying that he has a scientific basis for his ordering of which came first? Isn't there something where he says that he's relying on testimony and it is presumably the officer's testimony because it's not consistent with Reich's testimony? It's also Harry Mills' testimony who said that he went at the officer with chest puffed out. It's also David Mills, who is an independent witness 50 feet away, who said he didn't obey commands. They gave more warnings. He wouldn't drop the knife. Charged at the police aggressively with chest bowed out and they shot him six feet away. Independent witnesses and howl it, howl it. Now she does vacillate a little bit. We have her affidavit. We do have her statement. Why was he shot from six feet away? Here's the issue with distance, as you all see all the time. Nobody knows exactly because nobody had a tape measure. But Ms. Reich, if we want to use her testimony, and I agree with Judge Tappar when they're all over the board, I think you disregard that for summary judgment. She says, in her statement to the KSP immediately after, he was probably two feet away from me and they was two feet from me. So he was a good four feet from them. Then he asked some more and she said probably an arm's length. So the day of the incident she estimated it at four to six feet. My arms are 30 feet. That's not a sworn statement, right? That is correct. In the deposition she says 20 feet. And I disagree with how that was characterized. In the deposition she said, I don't know, I don't know, I don't know. And then I did say, can you give me a ballpark, 10, 20, 30, 50, you know, give me something. And she said 20. She goes, and then she backed it down to 17 or 18 because she said he did take a step forward. And the important point for the distance issue, I've looked at the case law, so have you. There's no case that says you have to be five feet or six feet or 20 feet or whatever. The issue is, was there an imminent threat? And the independent testimony establishes that there was an imminent threat. Is there a line with the feet that we can draw? I mean, what's the furthest distance? What if he was 50 feet? Would it be acceptable if they shot him? If he was threatening someone else, yes. I wouldn't think there would be a threat to the officer. No, no, your honor. I would think at 50 feet, I would think there would not be a threat, an immediate threat. What about 20 feet? Well, you know, there's that 21 foot rule that they all talk about that's a guideline. But this idea that with an edged weapon that you can close the distance within 21 feet faster than the officer can unholster and respond. But I thought they... So I think no. And I think that's why the case law doesn't do that, because we don't want to get into that. Yes, ma'am. Had the police pulled out their weapons at that point? Richardson unholstered his weapon as he was backing up to his car. So at what... The answer is yes. He had his weapon out. Yes, when? When they first saw him? No. As he made a beeline toward them? When he starts to think about shooting or think about the danger. When he raised his knife and said, you're going to have to kill me MF-er? Yeah, he had his gun out at that point. So the 21 foot rule is irrelevant then if Richardson had his weapon out. Well, I don't... I'm not relying on the 21 foot rule. He didn't have to unholster his gun in order to deal with an imminent... Yeah. He already had... Richardson already had his weapon out at that point. Is that correct? He had his weapon out within 21 feet. Yes, Your Honor. I think so. I'm not relying on the 21 foot rule. I don't think the courts do. I don't think we want to come up with a bright line rule. I thought you were the one who just mentioned the 21 foot rule. I did mention it, but I'm not relying on it. But I was just in response to a question. Let's not ignore the independent testimony of David Mills, of Harry Mills, of Ms. Reich. Anywhere from... So on distances four to six feet, Dr. Smock says... And here's the other thing before I leave that. If you look at... We talked about her statement and not being sworn, but it is on video. And when you watch her on video, they ask her, he didn't try to run away. And she goes like this. No. She raises her hands. I mean, it's very persuasive. She was 100% certain he didn't try to run away. Now, something's happened during this case that she's changed her tune. She's turning him around 180 degrees and her testimony's turned around 180 degrees. That's on video. We can all watch that. What is the legal standard by which the district court should view that change? I agree with Judge Tappar. I think you either disregard it or... Here's the thing, in my opinion, on the legal standard. You don't just take what the plaintiff says absolutely. I know it has to be viewed in a light most favorable to them, but you don't ignore independent testimony. You don't ignore objective proof in the record. You don't ignore the testimony of other witnesses. So when you put all of that together and you consider the totality of the circumstances... No, on summary judgment, you don't consider the totality of the circumstances. If there's a factual dispute, then the plaintiff wins. That's right. But if there's not a factual dispute, then you consider that testimony. And much of this evidence that we're talking about is undisputed. The district court's concern at that point is it's using its discretion. Am I correct? That is the standard by which the court decides whether or not to treat this affidavit as a later, post, etc., sham affidavit or whether to credit it. Yes, and that's the Myers case that we cite and there are others that she cites out of Ohio where they tried to tender an affidavit. And the timing on this affidavit is after summary judgment has been filed, our motion was filed, it was in response to our motion. Discovery had long since closed. It was way late. And her testimony in her deposition was she was so traumatized that she couldn't go back out to the scene, but when she's staring down the gun barrel of a motion for summary judgment, apparently she was healed quickly and could all of a sudden then go back to the scene. I'm not being adversarial, but that affidavit is a sham. It definitely shouldn't be considered. Judge Jennings wrote very simply, this is improper. And it is improper evidence and we all know that. There should have been a motion for leave filed to submit late affidavit or something like that. None of that was done. Very briefly... Has it changed the standard of discretion? I mean, why does the motion matter? Do you think it should have been done? It should not have been done. Exactly right. I'm sorry that I'm a little bit hazy on this, but I need your clarification. I seem to recall that there was a witness to the event who said in a police report, or was quoted as saying in a police report, that Mr. Blau turned around. No. And then that witness filed an affidavit saying that he didn't turn around. Can you refresh my memory on that? Yes. It's Helen Howlett, and she didn't say he turned around. I think we have to be critical. One is sworn, one is not. The affidavit is sworn testimony, her statement is not. There's a video clip that you can review. Did she change her view as to what had happened? I don't think so. What she said in her handwritten statement was he looked like he was trying to get away. Now, they've interpreted that as turning around and going the other direction, but I think those are different, and I'm not trying to pick at her words, but her sworn testimony is that he was still moving at the officers at the time he was shot, which is consistent with the other witnesses. Wouldn't there be at least a question as to which was more reliable, her statement contemporaneous with the event, which is written, you say it's a handwritten statement that is part of a police report. Yes, ma'am. Is that more reliable than a subsequent affidavit by the police? Is the same true for Ms. Resch would be my question. But you didn't answer mine. I think they can all be. There's been a problem throughout this argument. I understand. I understand. I'm stating my questions. It's irrelevant. No, I'm not. Okay. I absolutely am not. So wouldn't there be at least a question as to which is more reliable, Ms. Howley's contemporaneous statement to the police or her later affidavit? I think that's something that I think there is a question, but I think it's a legal question that a judge can determine. One is sworn testimony. One is not. So are you saying that there is a rule that a judge should follow, that the sworn testimony has to be believed over a contemporaneous police report? No. Okay. Whether it's Ms. Resch or whether it's Ms. Howley, I am not. I was dealing with Ms. Howley in particular because I thought she would be less, cause less emotional reaction by you. I don't mean to be emotional. But you agree for both of them. I know you like Resch's and you might not like the other one, but for both of them, neither are admissible, and that is a standard. Right? For summary judgment purposes, it has to be in a form that would ultimately be admissible. That is true. And unfortunately, Ms. Howley has since passed away. She was an elderly woman. The only proof that will be coming in at trial would be the sworn affidavit, I would argue. So I'm curious then, is a police report not admissible? That's true. Typically police reports are not admissible. I think the statements made can be relied on by experts and others. But the statements are hearsay within a police report unless you have an exception, like an excited utterance, like a present sense impression. And I think at trial you can cross-examine Ms. Resch or Ms. Howley, it is unavailable of course, but you can cross-examine those folks about this. But I think it all can be considered by us. The issue that I want to talk about briefly is the clearly established law. This court knows the law. But there are nine cases that we've cited. One that was decided, Pollard was decided in March of 2015. Newcomb, Rhodes, Boyd, Whitlow, Geddes, Sowers, Unterland, Chapel, and Pollard. There are cases where they've shot people on the ground. There are cases where there have been second volleys of shots. There are cases where people have, one person was retreating. One time they shot somebody in Pollard. They shot a guy 80 times. One time they shot him 16 times. One time the person had an unloaded gun. They shot a fleeing man with a gun 13 times. One person had a knife in their pocket. All those cases, in my estimation, the facts are worse than ours, worse meaning the police action was more egregious and qualified immunity was granted in each of those instances. In this situation, as this court is well aware, we get qualified immunity under two potential bases. One, was there a constitutional violation? Two, was that right clearly established? This self-defense that Richardson exhibited in this fact, it was not clearly established that you can't shoot a man coming at you with an edged weapon making a verbal threat. That was not clearly established at all. What if he's turning away? If he's turning away, if there's still a threat to someone else, I think that's an issue. There is a case. Was there evidence that he was a threat to someone else in the vicinity? I think he was, yes. The officer's testimony is that they perceived a threat to Ms. Reich. Also, there were 911 calls by two ladies who drove by the intersection. One of them expressed in the 911 call, I'm concerned about this lady out here. This guy's got a knife. He looks like he's going to stab someone. So there was hysteria in the neighborhood. There were 911 calls, and yes. So there was danger to Ms. Reich. There was danger to the people in the neighborhood. There's a 17-year-old girl walking down the streets of that neighborhood. Would it be relevant how close he was to those other people in the neighborhood? I think so. At one point, one of the eyewitnesses says they saw him on one of the back patios looking like he's trying to get in somebody's house. So I think absolutely. So that means then he could be shot in the back if he was going away, if he had been on someone's property? No, I didn't say that. You're asking about proximity to the people in the neighborhood, and he was close at times. The photos suggest that the places had very large yards. At least for someone who lives in a city, they look large. That may be a matter of opinion, but it's not a big – these aren't big homes in big yards. Is there a difference between someone having a knife and someone having a gun in terms of the danger to the people in the neighborhood? Yes, I think all of those facts have to be considered. Many of the cases that we've cited that are currently established involved edged weapons. But yes, I do think it's – I think all those facts have to be considered by you all, whether there's a gun, whether there's a knife, whether they're armed, whether they had toxic levels of meth, whether they were responsive. All of those things, all of those facts, in my opinion, on a de novo review, have to be considered by you all. Thank you. Thank you. Thank you, everyone. I wanted to bring up first – I heard something during that argument where he said we could cross-examine certain witnesses at trial, and we agree. That's all we're really asking for here. We're not asking for the case to be eminently decided in our favor today. Can I ask you one – I'm sorry to interrupt you. What's your best case for this is clearly established? Because it seems to me he made verbal threats. There's a lot of evidence that he was within a distance, which if they perceived he was a threat to themselves or others, they could do what they did. So what's your best case? My best case is Bouges v. Mattingly, where a suspected crack dealer was wrestling with a police officer, had a weapon on him, and eventually broke away and started to run. That police officer believed that person was threatening. They'd been in a physical altercation with him, which is a much more threatening circumstance than the verbal words that were ordered here. Whether or not that's a threat I think is a question for the jury. And the court ruled that – Did he have a weapon in that case? I can't remember. He did. It's unclear if the officer knew about it. And that's not the case where the weapon dropped to the ground? Because we've also got a case where the same situation – we have several cases where the weapon dropped to the ground, but in those cases there was a reasonable belief that the weapon dropping to the ground was a more aggressive maneuver based on the officer's perception. I think it's important to note Tolan v. Cotton here. There's a lot of similarities in that case and ours. And Tolan was not something that decided qualified immunity or not at that stage. It just says this needs to go to trial. And the material issues of fact in that case were whether certain spoken words were a threat that are similar to the spoken words that we have in this case, the positioning of the parties, the lighting conditions, and basically the nature of the scene at the time. And Tolan says you can't just accept the police officer's version of facts. There's another case that says you have to look at the circumstantial evidence, which if it tends to discredit the officer's statements, you have to give some weight to that. And at summary judgment, everyone has to look at the totality of the circumstances and not make credibility determinations. The district court said in its own opinion there's a dispute whether the plaintiff was still approaching the officers or had stepped to turn away. That's a note right there that the district court should refrain from weighing that in their favor, yet they didn't do that. They said we're going to act as if he's still approaching the officers and use that. Your opponent argues that Mr. Blau would be a danger to others in the community. How do you respond to that? It's my understanding that at the time of the shooting, no one was outside in the neighborhood. By that time, everyone had gone back into their houses. And the police officer's main concern when shooting was actually their backdrop, whether they were going to hit a house in the neighborhood. They didn't mention if they were concerned about anyone outside. What about Ms. Reich? Was she at risk of being hurt by Mr. Blau? I think the police officer's own actions show that they did not perceive it that way. They not only allowed her but encouraged her to approach Mr. Blau to try to defuse the situation. They can't realistically argue that all of a sudden she was under this huge threat after they'd already told her to go up and talk to him. Was there evidence in the record as to how close she was to Mr. Blau at the time Mr. Blau was shot? At the time he was shot, I don't think there was any affirmative evidence how far away she was. At some point before he was shot, she was within an arm's length and she had since moved farther away. Thank you. Thank you. Thank you both for your argument. The case will be submitted. And would the clerk call the next case, please?